UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

09 CV 1751

U.S. COMMODITY FUTURES TRADING
COMMISSION,

          Plaintiff,

          v.

MARK EVAN BLOOM AND NORTH HILLS
MANAGEMENT, LLC,

          Defendants, and

LAUREN BLOOM,

          Relief Defendant.

Civil Case No. _____

COMPLAINT FOR INJUNCTIVE
AND OTHER EQUITABLE
RELIEF AND CIVIL MONETARY
PENALTIES UNDER THE
COMMODITY EXCHANGE ACT



By and for its complaint, the U.S. Commodity Futures Trading Commission ("CFTC" or
"Commission") alleges as follows:

## I.   SUMMARY

1.   Since at least 2002 through the present ("relevant period"), defendants Mark Evan
Bloom ("Bloom") and North Hills Management, LLC, ("NHM") (collectively, the
"Defendants"), an unregistered commodity pool operator ("CPO"), misappropriated at least $13
million from North Hills, LP. ("North Hills Fund" or "Fund"), a commodity interest pool
operated by NHM. NHM is the General Partner of the North Hills Fund and Bloom is the sole
principal and owner of NHM. Based on representations of Defendants, the North Hills Fund has
received approximately $30 to 40 million from approximately 47 Fund participants. In late
2008, Defendants, through counsel, acknowledged to certain North Hills Fund participants that
they had taken North Hills Fund assets through promissory notes executed between NHM and

North Hills Fund by Bloom, and used the funds for personal expenses of Bloom and his wife, Relief Defendant Lauren Bloom.

2.    NHM and Bloom further defrauded and deceived the North Hills Fund and its participants by making material misrepresentations and failing to disclose material facts to the North Hills Fund participants regarding their assets.

3.    In or around 2001, Defendants purportedly converted North Hills Fund into a "fund of funds" and represented to existing and prospective North Hills Fund participants that North Hills Fund assets would be allocated across multiple funds and fund managers to ensure diversification and moderate risk.  However, commencing in February 2004, Defendants invested a total of $17 million of North Hills Fund assets in a high risk commodity futures and options fund called the Philadelphia Alternative Asset Fund, L.P ("PAAF"), which was operated by another CPO, the Philadelphia Alternative Asset Management Company ("PAAM").  This investment was half or more than half of the North Hills Fund assets and was contrary to the multiple fund moderate risk asset allocation represented in the North Hills Fund Private Placement Memorandum and other solicitation materials.  North Hills Fund participants did not know of the PAAF investment until July 2005, at which time Defendants notified them that the CFTC had filed an action against PAAM and its principal trader Paul Eustace ("Eustace") charging them with fraud and misappropriation in connection with several funds, including PAAF.

4.    Likewise, Defendants did not disclose to North Hills Fund participants that in 2004 and 2005, Bloom was a third party marketer for PAAM and was collecting commissions for referring participants to PAAM and the funds it managed, including PAAF.  From 2004

through 2005, Bloom collected over $1.6 million in commissions from PAAM, as he was moving North Hills Fund assets into PAAF.

5.       After the CFTC filed its action against PAAM and Eustace, from 2005 through 2008, Defendants routinely informed North Hills Fund participants in writing of the status of the CFTC's action and the efforts of the Receiver appointed in the CFTC action to recover and distribute assets. Upon information and belief, through four distributions, the Receiver distributed approximately $9 million in the name of the North Hills Fund. However, Defendants never disclosed to North Hill Fund participants that in the fall of 2006, Defendants had compromised the amount of recovery possible by North Hills Fund by assigning its interest in PAAF to a third party and that upon information and belief, Defendants had received upfront approximately $2.3 million and thereafter additional payments through that agreement, for a total payment of approximately $8 million. It is unknown how much, if any, of the approximate $8 million has been returned to the North Hills Fund or its participants.

6.       After learning about PAAF in July 2005, certain North Hills Fund participants began asking questions and requesting full redemptions. Despite issuing statements showing positive balances to North Hill Fund's participants throughout the relevant period, Defendants used delaying tactics and made only partial redemptions to certain participants and no redemptions to others.

7.       Defendants appear to be continuing to solicit funds in the name of the North Hills Fund.

8.       Relief Defendant Lauren Bloom received assets of North Hills Fund to which she has no legitimate interest and must disgorge those assets back to the North Hills Fund.

9.     Defendants have engaged, are engaging, or are about to engage in acts or practices that violate the anti-fraud provisions of Sections 4b(a)(2), 4c(b) and 4o(1) of the Commodity Exchange Act (the "Act"), 7 U.S.C. §§ 6b(a)(2) and 6o(1) (2006), Section 4b(a)(1) of the Act as amended by the Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, Title XIII (the CFTC Reauthorization Act of 2008 ("CRA")), § 13102, 122 Stat. 1651 (effective June 18, 2008), to be codified at 7 U.S.C. § 6b(a)(1), and Commission Regulation 33.10, 17 C.F.R. § 33.10 (2008).

10.    By acting as an unregistered CPO of North Hills Fund, NHM has engaged, is engaging, or is about to engage in acts or practices that violate the registration provision of Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2006), and by soliciting funds for NHM, Bloom acted as an unregistered associated person ("AP") of NHM and as such, has engaged, is engaging, or is about to engage in acts or practices that violate the registration provision of Section 4k(2) of the Act, 7 U.S.C. § 6k(2) (2006).

11.    Bloom directly or indirectly controls NHM and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting NHM's violations alleged in this Complaint, and therefore is liable for NHM's violations of the Act and Commission Regulations pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2006).

12.    Bloom was acting as an agent of NHM when he committed the acts, omissions, or failures alleged in this Complaint, and therefore NHM, as Bloom's principal, is liable for Bloom's violations of the Act and Commission Regulations pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006).

4

13.     Unless restrained and enjoined by this Court, the Defendants are likely to continue to engage in the acts and practices alleged in this Complaint and in similar acts and practices, as more fully described below.

14.     Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2006), the Commission brings this action to enjoin such acts and practices, prevent the dissipation of assets, and compel compliance with the provisions of the Act. In addition, the Commission seeks civil monetary penalties, an accounting, restitution, disgorgement and such other equitable relief as the Court may deem necessary or appropriate under the circumstances. The Commission also seeks disgorgement of customer funds from Lauren Bloom, the Relief Defendant.

## II.     JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2006), which authorizes the Commission to seek injunctive relief against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation or order thereunder.

16.     Venue properly lies with this Court pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1(e) (2006), in that the Defendants transacted business in this District, and the acts and practices in violation of the Act have occurred, are occurring, or are about to occur within this District, among other places.

## III.     THE PARTIES

### PLAINTIFF

17.     Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged with responsibility for administering and enforcing the

provisions of the Act, 7 U.S.C. §§ 1 *et seq.* (2006), and the regulations promulgated thereunder, 17 C.F.R. §§ 1 *et seq.* (2008).

## DEFENDANTS

18.   Defendant **Mark Evan Bloom** resides in New York City, New York.  He is the sole principal and 100% owner of NHM.  Bloom is registered with the CFTC as a CPO but does not appear to use that registration in connection with NHM.  Bloom is also Chief Marketing Officer, Managing Partner, and Director of MB Investments Partners, Inc., which at one time operated at least two commodity pools, MB Absolute Fund, LLC and MB Absolute Fund, Ltd ("MB Absolute Funds"), which were also invested in funds operated by PAAM.  Bloom also is or was Chief Operating Office and Managing Partner of Munn Bernhard & Associates which used to operate the MB Absolute Funds.  He also was a managing partner at BDO Seidman, L.L.P.  From May 1992 to July 2001, Bloom was a partner of WG Trading Co., L.P.  On February 9, 2009, the National Futures Association ("NFA"), a self-regulatory organization for the commodity futures and options industry to whom the CFTC has delegated certain functions, issued a Membership Responsibility Action ("MRA") against Bloom and suspended his NFA membership based on his failure to cooperate with the NFA.

19.   Defendant **North Hill Management LLC** is located in New York City, New York and is a New York limited liability company.  NHM currently operates the North Hills Fund, which is a New York limited partnership that, as of 2001, was to act as "a money management intermediary, investing the Partnership's capital in carefully selected investment partnerships."  Among the funds that Defendants invested North Hills Fund's assets was PAAF, a commodity interest pool that traded exclusively commodity futures contracts and options. NHM was registered with the Commission as a CPO and a commodity trading advisor from

1997 to 2002, when it withdrew its registration. NHM did not file a Notice of Exemption from registration with the Commission. During the relevant period, Bloom acted as an agent for NHM.

## IV.   FACTS

### A.   Formation and Operations of NHM and North Hills Fund

20.   In or around 1995, Bloom formed the North Hills Fund and created NHM, as the general partner of the North Hills Fund. Bloom is the sole principal and owner of NHM. The North Hills Fund initially was purportedly designed to be an enhanced stock index fund and traded, among other instruments, commodity futures contracts and options. In 2001, Bloom converted the Fund to an "absolute return fund" that would invest in other funds, i.e., a "fund of funds."

21.   Defendants represented orally and in writing to existing and prospective North Hills Fund participants that Defendants would invest North Hills Fund assets in a number of other funds and through diversification and lack of correlation, achieve a "market-neutral" return of approximately 12%.

22.   Defendants provided existing and prospective North Hills Fund participants with a Private Placement Memorandum ("PPM") dated July 27, 2001, which attached a copy of the North Hills Limited Partnership Agreement (the "LPA"), subscription materials, and a Partnership Agreement Supplement. The LPA identifies the objects and purposes of the North Hills Funds as investing and trading, on margin or otherwise, in all forms of financial investments, including in commodities and commodity contracts.

23.   The PPM represents that "[t]he Fund's multi-manager, multi-strategy approach has been designed to achieve above-average capital appreciation consistent with moderate risk."

The PPM emphasizes that "[t]hrough a program of diversified asset management, the Fund will be able to take advantage of investment opportunities with a significant potential reward, while reducing the risk of a substantial decline in the value of Partnership assets."  Similarly, the PPM states that a principal advantage of the North Hills Fund is its "policy of seeking satisfactory returns while minimizing total risk."

24.     According to the PPM and LPA, North Hills Fund participants were to receive monthly reports and annual financial statements audited by an independent certified public accountant.

25.     The PPM also provides for management and incentive fees for NHM based on profitability of the North Hills Fund.

26.     The PPM also states that NHM uses a management team comprised of consultants of Access International Advisors, EIM, USA and members of the Board of Directors that was to be responsible for the selection of money managers.  It is unknown whether such a management team ever existed or was used by Defendants.

27.     Defendants instruct prospective North Hills Fund participants to execute a copy of the Solicitation Materials and send a check payable to North Hills LP.  The minimum initial capital contribution allowed is $250,000.

28.     Based on Defendants' representations, the North Hills Fund has at least 30-40 participants and should have had assets of at least $30-40 million at one time.

29      North Hills Fund participants relied upon Defendants' representations, the PPM, LPA and other solicitation and information concerning the North Hills Fund trading strategy in deciding whether to invest, remain invested or make additional investments with Defendants and the North Hills Fund.

8

30.     The North Hills Fund participants included the Alexander Dawson Foundation ("ADF") and Alexander Dawson Inc. ("ADI"). ADF is a Nevada Charitable Trust that supports schools and over 1,000 students in Nevada and Colorado. ADI is an investment arm of ADF. ADI and ADF's investment goals were to achieve moderate returns with limited risk. Because Defendants' representations concerning the investment strategy for the North Hills Fund was consistent with their goals for their charitable endeavors, ADI and ADF decided to maintain their prior investments with North Hills Fund and over time increased in their investments. ADF and ADI collectively invested $13.5 million with Bloom and NHM through the North Hills Fund.

31.     North Hills Fund participants received monthly account statements that consistently showed positive returns. North Hills Fund participants relied on these statements and made additional investments in the Fund.

32.     Although required by the LPA to provide annual financial statements to participants in the Fund, Defendants did not.

**B.     Defendants' Misappropriation of At Least $13 Million of Fund Assets**

33.     During the relevant period, Defendants misappropriated at least $13 million of the assets of North Hills Fund for the personal use of Bloom and his wife, Relief Defendant Lauren Bloom. Defendants took the assets of the Fund by executing purported promissory notes with the Fund bearing an interest rate of the higher of 8% or the rate of return earned on all other Fund assets, net of expenses.

34     A purported independently certified annual financial statement for North Hills Fund for the year ended December 31, 2002 lists notes receivable in the amount of $2.75 million as assets of the Fund. The notes to the financial statement sets forth two notes as receivables from NHM to the Fund and states that "[t]he notes receivable were issued as capital

9

contributions by [NHM]." At least certain, if not all, of the North Hills Fund participants never received this financial statement until around or after November 2008.

35.     A purported independently certified financial statement for North Hills LP for the year ended December 31, 2003 lists additional notes receivable in the amount of $5.255 million as assets of the Fund as well as the 2002 notes for a total of approximately $8 million. The notes to the financial statement set forth the notes as receivables from NHM to the Fund and states that "[t]he notes receivable were issued as capital contributions by [NHM]" and were charged against management's capital." At least certain, if not all, of the North Hills Fund participants never received this financial statement until around or after November 2008.

36.     A Consolidated and Restated Demand Note ("the Consolidated Note") in the amount of $13,230,000.00 and dated December 31, 2004 was executed by Bloom on behalf of NHM through which NHM "borrowed" the assets of the Fund with promise to repay at the interest rate of the greater of 8% or the rate of return earned on all other Fund assets, net of expenses. The Consolidated Note was payable on demand. However, the North Hills Fund's General partner was NHM and NHM executed the Note on behalf of the North Hills Fund and itself. Upon information and belief, NHM on behalf of the North Hills Fund never demanded payment on the Consolidated Note from itself or Bloom.

37.     By the same date of December 31, 2004, Bloom executed a Guaranty Agreement to and in favor of North Hills Fund in his name and his wife's name through which he personally guaranteed payment and performance on the Consolidated Note. The Guaranty Agreement provides that the funds borrowed may in whole or in part be provided to or for the benefit of the Guarantors, the Blooms, and provides that each Guarantor will benefit or has materially benefited from the proceeds of the Consolidated Note.

38.    Until recently, Defendants did not disclose to any North Hills Fund participants the material fact that they were taking assets of North Hills Fund to benefit personally Bloom and his wife.

39.    By letter dated November 7, 2008, Defendants' counsel disclosed to certain North Hills Fund participants that "other than assets allocated to [PAAF] the remaining assets are in the form of notes payable from NHM which is presently unable to repay the debt." Counsel did not know the exact amount of debt outstanding but stated it was in excess of $8 million.

40.    Throughout the relevant period, as the Blooms were taking more than $13 million of North Hills Fund assets, the Blooms have maintained a lavish life style. For example, in or around March 3, 2003, the Blooms purchased a luxury apartment at 10 Gracie Square on the Upper East Side of Manhattan for $5.2 million. Two years later, on around June or July 2005, Bloom transferred his ownership to his wife who sold it in 2007 for $11.2 million.

41.    During the relevant period, Bloom and his wife maintained multiple apartments in Upper Manhattan, owned beach houses in Florida and New Jersey, and several luxury cars and boats.

42.    North Hills Fund participants would not have invested or maintained investments with Defendants and the North Hills Fund if they had known that Defendants had engaged in self-dealing and taken at least $13 million of Fund assets. However, because they did not know and instead were receiving monthly statement showing profitable returns, North Hills Fund participants made additional investments in the North Hills Fund throughout the relevant period.

C.   **Defendants Invest Contrary to Represented Investment Strategy and
Fail to Disclose Conflict of Interest with PAAF Investment**

43.     Commencing in or around January 2004, Bloom entered into a Client Referral
and Fee Sharing Agreement with PAAM, a registered CPO managing multiple commodity
futures and options pools, including PAAF.

44.     Pursuant to that agreement, PAAM paid Bloom fees for directly or indirectly
referring investors to the funds managed by PAAM. Bloom received approximately $1.6 million
for referring investors to PAAM.

45.     Commencing in February 2004 and thereafter, Defendants invested assets of
North Hills Fund in PAAF, and Bloom collected referral fees of approximately $356,000 based
on the North Hills Fund investment in PAAF.

46.     Eventually, Defendants had a total of approximately $17 million of North Hills
Fund assets in PAAF, which comprised approximately half or more than half of the assets of
North Hills Fund. This concentration in one fund was contrary to the multi-asset, multi-
manager, diversified strategy represented in the PPM and LPA.

47.     In addition, PAAF traded exclusively commodity futures and options, which are
highly risky and contrary to the diversification with reduction of risk approach North Hills Fund
represented by Defendants in the PPM to be the investment strategy of the Fund and why North
Hills Fund participants invested with Defendants and the North Hills Fund.

48.     North Hills Fund participants did not learn of the concentrated and risky
investment in PAAF until July 2005 when Defendants informed them that the CFTC had filed a
massive fraud action against PAAM and Eustace and seized the assets under their control,
including the assets of PAAF. *CFTC v. Philadelphia Alternative Asset Management Co, and*

*Eustace,* Civ. Action 05-CV-2973 (MMB), filed in the United States District Court for the Eastern District of Pennsylvania.

49.     North Hills Fund participants were shocked to learn of the concentrated investment in PAAF and do not view it as consistent with the investment strategy of the North Hills Fund represented in the PPM and LPA.

50.     Like his failure to disclose that he had "loaned" his wife and himself $13 million of North Hills Fund assets through promissory notes issued by NHM, Bloom never disclosed to North Hills Fund participants that he was a third party marketer for PAAM and earning fees based on the Fund's investment with PAAM.  Bloom did not disclose it even after he disclosed the concentrated investment in PAAF.

51.     Instead of disclosing that Defendants had taken $13 million of Fund assets, that more than half of the assets were concentrated in one highly risky commodity futures and options fund and that Bloom was collecting commissions off North Hills Fund's investment from PAAM, Defendants continued to issue false statements that misrepresented the nature and status of the North Hills Fund.  For instance, in April 2004, Defendants issued to certain North Hills Fund participants an "Executive Summary" for the Fund that reiterated the balanced fund with a multi-strategy diversified risk approach.  The Executive Summary provided investment allocation information, set forth the purported annual rates of return for each purported manager used, and represented that the Fund's average annual rate of return from July 2001 through December 2003 was 11.27%.

52.     In addition, Defendants were meeting with North Hills Fund participants and orally making similar material misrepresentations and omissions.

13

53.     To reassure certain North Hills Fund participants concerning the Defendants'
compliance and diligence, Defendants retained a purported third-party sub-advisor who also met
with participants. Through the sub-advisor, Defendants issued performance reports in June
2004, June 2005 and June 2006. None of the performance reports disclosed the $13 million of
assets taken by NHM for Bloom and his wife's use. The June 2005 report purports to list the
funds in which North Hills Fund was invested. The June 2005 report did not list the
approximately $17 million in PAAF and instead listed the allocations as follows: Airlie 10%,
Centrix 5%, Gramercy 25%, Millennium 25%, Stewardship 25%.

**D.     In 2006, Bloom Testifies that a Fund Manager Should Disclose Conflicts and
He Would Never Invest Where a Fund Manager Loans Himself Fund Assets**

54.     Bloom knew or recklessly disregarded that borrowing funds and collecting third
party fees were conflicts of interest and material facts reasonable investors would have wanted to
know. In fact, in sworn testimony in the CFTC's action against PAAM and Eustace in 2006,
Bloom vehemently testified that defendant Eustace should have disclosed similar types of
"loans" he made to himself out of PAAF assets and that Bloom never would have invested with
Eustace if he had known Eustace was borrowing PAAF assets. Bloom gave this sworn testimony
after he had already "borrowed" $13 million of North Hills Fund's assets.

> Q: Similarly, throughout the life of the operations of PAAM, were you ever told
> that the [PAAF] Fund monies were invested either directly or indirectly into
> personal trading accounts of Mr. Eustace?
>
> A: Absolutely not, no.
>
> ...
>
> Q: If ultimately through either a single transaction or a series of transactions the
> LP Fund assets were to be invested directly into the personal trading accounts of
> Mr. Eustace, is that a fact you would have expected to be disclosed up front?
>
> A. Yes, And it would be alarming.

14

Q. Do you expect an investment manager to disclose potential conflicts of interest?

A. Yes.

Q. Would you consider this to be a conflict of interest?

A. If I was told that this fund was investing in the private accounts of the manager and that the strategy was being traded there, I would have never invested in this fund.

...

Q. Would you have put any of your investors into funds controlled by Eustace had you known that assets that would be invested in [PAAF] would be funneled as a loan to Eustace ...

A. I would not.

E.    **Defendants Misrepresent the Status of the North Hills Fund's Interests in PAAF**

55.    In the CFTC's action against PAAM and Eustace, the Court immediately appointed a Receiver to marshal and distribute assets belonging to the various funds operated by PAAM and/or Eustace, including PAAF. The various funds defrauded by PAAM and Eustace had assets invested totaling approximately $250,000,000.00 with PAAF having approximately $27 million. North Hills Fund's assets comprised more than half of the PAAF assets.

56.    As of end of December 2008, the Receiver in the PAAM litigation had distributed approximately $161 million for distribution across all the funds. Approximately $18 million of the $161 million was apportioned to PAAF and another fund into which Eustace had moved PAAF assets. North Hills Fund's percentage interest in the approximate $18 million was approximately 54%.

57.    The Receiver assigned total distributions in the name of North Hills Fund of approximately $9 million. Four distributions were made in the name of North Hills Fund: 1) on

15

December 26, 2006, approximately $1.8 million; 2) on February 15, 2008, approximately $4.2 million; 3) on March 5, 2008, approximately $1.6 million; and 4) on December 28, 2008, approximately $ 1.7 million. (These numbers are approximations and do not account for various holdbacks and other adjustments by the Receiver.)

58.     On or around September 27, 2006, unbeknownst to North Hills Fund participants, Bloom, on behalf of the North Hills Fund, executed a Participation Agreement with Stonehill Institutional Partners, L.P. ("Stonehill"). Pursuant to this agreement, Bloom compromised any return the North Hills Fund would receive out of the receivership estate in the PAAM case. The Participation Agreement granted Stonehill a participation interest in the North Hills Fund's interest in PAAF and any amounts payable to North Hills Fund from PAAF and the Receiver. As evidenced by executed instructions to the Receiver, all distributions in the name of the North Hills Fund were to be made to Stonehill with correspondence and other information continuing to be sent to Defendants.

59.     Upon information and belief, pursuant to the Participation Agreement, Bloom received from Stonehill in the name of North Hills Fund upfront payments of approximately $2.3 million. Stonehill recovered the upfront payments plus 20% interest thereon through the initial distributions from the Receiver. Thereafter, Stonehill retained 20% of any PAAF distributions to the Fund and forwarded the remaining 80% to Bloom in the name of North Hills Fund. Accordingly, upon information and belief, Bloom received in the name of North Hills Fund approximately $8 million from Stonehill.

60.     Defendants did not disclose to North Hills Fund participants that Bloom had entered into the Participation Agreement with Stonehill. To the contrary, Bloom routinely sent written updates on the status of the CFTC's action, the Receivership estate and the likelihood of

16

recovering assets without ever mentioning the Stonehill agreement, that the Receiver had made distributions and that Bloom had received payments relating to the PAAF distributions. Defendants also continued to send out monthly statements to North Hills Fund participants that did not credit or otherwise account for such distributions.

61.    North Hills Fund participants expected any distributions made by the Receiver in the name of the North Hills Fund to then be distributed appropriately through the North Hills Fund to them by Defendants.

62.    At this time Bloom's handling and disposition of those North Hills Fund PAAF assets from Stonehill is unknown.

63.    After the filing of the CFTC action against PAAM and Eustace, North Hills Fund participants began requesting full redemptions from the North Hills Fund, which have not occurred. Some Fund participants received partial redemptions; others have received nothing. North Hills Fund participants are out millions of dollars due to Defendants' fraud. Defendants have used and are using delaying tactics, lies, obfuscations and excuses ranging from poor liquidity to blaming the Madoff debacle to avoid meeting those demands.

64.    For example, in August 2005, after learning of the PAAM fraud, two related North Hills Fund participants, ADF and ADI, who collectively had invested approximately $13.5 million immediately questioned Defendants and asked about redemptions. Bloom promised that they would not lose anything as a result of the PAAF demise and made a partial redemption payment of $4 million in the fall of 2005. On November 30, 2007, they requested redemption of $3.5 million. Bloom tried to delay on honoring that request with excuses of a plan to increase performance with a new manager. In January 2008, ADF and ADI requested a full redemption of their entire $13.8 million or at least the $4.8 million of their funds that was not purportedly in

the PAAF investment. In March 2008, Defendants redeemed only $1 million to them. Throughout, Defendants continued to send monthly statements showing positive balances. For instance, ADF and ADI received September 30, 2008 account statements showing collectively that they had over $12 million in capital with approximately $7.7 million allocated to PAAF and showing a gain of approximately $5,000 on the remaining $4.7 million. In October 2008, ADF and ADI demanded documentation and an accounting of their investments and the assets of North Hills Fund. Eventually, they learned through Bloom's counsel that he had taken assets of North Hills Fund as "loans" to himself.

65.     Since the filing of the CFTC's action against PAAM and Eustace, Bloom has personally appeared in federal court in that action representing the North Hills Fund and other funds he managed and claiming to be a victim of fraud.

66.     Defendants knowingly or with reckless disregard committed the foregoing acts of fraud, misappropriation, false statements and reports, and material misrepresentations and omissions of fact.

67.     Defendants appear to be continuing to solicit new funds from new prospective participants and trying to delay meeting demands from North Hills Fund participants. Indeed, by letter dated February 11, 2009 on North Hills Fund letterhead, Bloom represented "I am in the process of securing funds which should allow me to return the full amount of your investment balance. My hope is that it can be all worked out in the next month. I ask for your patience, as my success in that endeavor offers you the greatest chance for the best possible return of your investment."

18

## V.    VIOLATIONS OF THE COMMODITY EXCHANGE ACT

### COUNT I

### Violations of Section 4b of the Act as Amended by the CRA:  Futures Fraud

68.    Paragraphs 1 through 67 are re-alleged and incorporated herein.

69.    Sections 4b(a)(2)(i)-(iii) of the Act, 7 U.S.C. §§ 6b(a)(2)(i)-(iii) (2006), make it unlawful for any person to cheat or defraud or attempt to cheat or defraud; or willfully make or cause to be made to other persons false reports or statements, or willfully enter or cause to be entered for other persons false records; or willfully deceive or attempt to deceive by any means whatsoever other persons in or in connection with orders to make, or the making of, contracts of sale of commodities, for future delivery, made, or to be made, for or on behalf of such other persons where such contracts for future delivery were or may have been used for (a) hedging any transaction in interstate commerce in such commodity, or the produce or byproducts thereof, or (b) determining the price basis of any transaction in interstate commerce in such commodity, or (c) delivering any such commodity sold, shipped or received in interstate commerce for the fulfillment thereof.

70.    Sections 4b(a)(1)(A)-(C) of the Act as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(1)(A)-(C), make it unlawful for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person – (A) to cheat or defraud or attempt to cheat or defraud the other person; (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; or (C) willfully to deceive or attempt to deceive the other person by any means

19

whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for the other person.

71.     During the relevant period, Bloom and NHM violated Sections 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C. §§ 6b(a)(2)(i) and (iii) (2006), with respect to acts occurring before June 18, 2008, and violated Sections 4b(a)(1)(A) and (C) of the Act as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(1)(A) and (C), with respect to acts occurring on or after June 18, 2008, in that they cheated or defrauded or attempted to cheat or defraud and willfully deceived or attempted to deceive pool participants by, among other acts:  misappropriating assets of North Hills Fund for Defendants' personal benefit, failing to disclose that Defendants had taken the assets of the Fund, failing to disclose that Defendants had concentrated more than half of the Fund's assets in PAAF, investing Fund assets contrary to the investment strategy represented in the PPM, failing to disclose that Bloom was receiving commissions from PAAM based on North Hills Fund's investment in PAAF, misrepresenting the likelihood of recovery from PAAF, failing to disclose that Defendants had entered into an agreement that compromised the amount of funds to be received from PAAF, misrepresenting the status of distributions to be made by the Receiver, failing to disclose that Defendants had received funds related to the PAAF and issuing false statements concerning the nature and status of the North Hills Fund and participants' interest.

72.     Bloom and NHM also violated Section 4b(a)(2)(ii) of the Act, 7 U.S.C. § 6b(a)(2)(ii) (2006), with respect to acts occurring before June 18, 2008, and violated Section 4b(a)(1)(B) of the Act as amended by the CRA, to be codified at 7 U.S.C. § 6b(a)(1)(B), with respect to acts occurring on or after June 18, 2008, in that they cheated or defrauded or attempted

20

to cheat or defraud pool participants by willfully making or causing to be made false reports or statements to the North Hills Fund participants concerning the nature and status of the North Hills Fund and participants' interests and the nature and status of the PAAF investment and related distributions.

73.    Defendants engaged in this conduct before June 18, 2008 in or in connection with orders to make, or the making of, contracts of sale of commodities, for future delivery, made, or to be made, for or on behalf of such other persons where such contracts for future delivery were or may have been used for (a) hedging any transaction in interstate commerce in such commodity, or the produce or byproducts thereof, (b) determining the price basis of any transaction in interstate commerce in such commodity, or (c) delivering any such commodity sold, shipped or received in interstate commerce for the fulfillment thereof.

74.    Defendants engaged in this conduct on or after June 18, 2008 in or in connection with orders to make, or the making of, contracts of sale of a commodity in interstate commerce or for future delivery made, or to be made, on or subject to the rules of a designated contract market.

75.    Bloom directly or indirectly controlled NHM and did not act, and is not acting, in good faith or knowingly induced or is inducing, directly or indirectly, the acts constituting NHM's violations alleged in this count.  Bloom is thereby liable for NHM's violations of Sections 4b(a)(2)(i)-(iii) of the Act, 7 U.S.C. §§ 6b(a)(2)(i)-(iii) (2006), with respect to acts occurring before June 18, 2008, and for NHM's violations of Sections 4b(a)(1)(A)-(C) of the Act as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(1)(A)-(C), with respect to acts occurring on or after June 18, 2008, as a controlling person, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2006).

76.     Bloom was acting as an agent of NHM when he violated the Act and, therefore, NHM, as Bloom's principal, is liable for Bloom's violations of Sections 4b(a)(2)(i)-(iii) of the Act, 7 U.S.C. §§ 6b(a)(2)(i)-(iii) (2006), with respect to acts occurring before June 18, 2008, and for Bloom's violations of Sections 4b(a)(1)(A)-(C) of the Act as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(1)(A)-(C), with respect to acts occurring on or after June 18, 2008, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006).

77.     Each material misrepresentation or omission, each false report or statement, and each misappropriation made during the relevant period, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Sections 4b(a)(2)(i)-(iii) of the Act, 7 U.S.C. §§ 6b(a)(2)(i)-(iii) (2006), with respect to acts occurring before June 18, 2008, and a violation of Sections 4b(a)(1)(A)-(C) of the Act as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(1)(A)-(C), with respect to acts occurring on or after June 18, 2008, the effective date of the CRA.

## COUNT II

## Violations of Section 4c(b) of the Act and Regulations 33.10(a)-(c): Options Fraud

78.     Paragraphs 1 through 77 are re-alleged and incorporated herein.

79.     Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2006), provides that no person shall engage in any commodity option transaction regulated under the Act contrary to any rule, regulation, or order of the Commission.  Furthermore, Commission Regulations 33.10 (a)-(c), 17 C.F.R. §§ 33.10(a)-(c) (2008), make it unlawful for any person, directly or indirectly,

> (a) to cheat or defraud or attempt to cheat or defraud any other person; (b) to make or cause to be made to any other person any false report or statement thereof or cause to be entered for any person any false record thereof; [or] (c) to deceive or attempt to deceive any other person by any means whatsoever; in or in connection with . . . any commodity option transaction.

80.     During the relevant period, NHM and Bloom violated Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2006), and Commission Regulations 33.10 (a)-(c), 17 C.F.R. §§ 33.10(a)-(c) (2008), by, among other acts: misappropriating assets of North Hills Fund for Defendants' personal benefit, failing to disclose that Defendants had taken the assets of the Fund, failing to disclose that Defendants had concentrated more than half of the Fund's assets in PAAF, investing Fund assets contrary to the investment strategy represented in the PPM, failing to disclose that Bloom was receiving commissions from PAAM based on North Hills Fund's investment in PAAF, misrepresenting the likelihood of recovery from PAAF, failing to disclose that Defendants had entered into an agreement that compromised the amount of funds to be received from PAAF, misrepresenting the status of distributions to be made by the Receiver, failing to disclose that Defendants had received funds related to the PAAF and issuing false statements and reports concerning the nature and status of the North Hills Fund and participants' interests and the nature and status of the PAAF investment and related distributions.

81.     Bloom, directly or indirectly controlled NHM and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting NHM's violations alleged in this count. Bloom is thereby liable for NHM's violations of Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2006), and Commission Regulations 33.10 (a)-(c), 17 C.F.R. §§ 33.10(a)-(c) (2008), pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2006).

82.     Bloom was acting as an agent of NHM when he violated the Act and, therefore, NHM, as Bloom's principal, is liable for Bloom's violations of Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2006), and Commission Regulations 33.10 (a)-(c), 17 C.F.R. §§ 33.10(a)-(c) (2008), pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006).

23

83.     Each act of making false reports, false statements, and material omissions, and each misappropriation that occurred during the relevant period, including but not limited to those specifically alleged herein, is alleged as separate and distinct violations of Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2006), and Commission Regulations 33.10 (a)-(c), 17 C.F.R. §§ 33.10(a)-(c) (2008).

## COUNT III

### Violations of Section 4o(1) of the Act:  Fraud by a CPO and by an AP of a CPO

84.     Paragraphs 1 through 83 are re-alleged and incorporated herein.

85.     During the relevant period, NHM acted as a CPO in that it engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise and in connection therewith, has solicited, accepted or received funds, securities or property from others for the purpose of trading in any commodity interest on or subject to the rules of any contract market or derivatives transaction execution facility.

86.     Bloom acted as an AP of a CPO in that he solicited funds for NHM.

87.     During the relevant period, NHM and Bloom violated Section 4o(1) of the Act, 7 U.S.C. § 6o(1) (2006), in that as a CPO and an AP of a CPO, they directly or indirectly employed or are employing a device, scheme, or artifice to defraud commodity pool participants, or have engaged or are engaging in transactions, practices or a course of business which operated as a fraud or deceit upon commodity pool participants by, among other acts:  misappropriating assets of North Hills Fund for Defendants' personal benefit, failing to disclose that Defendants had taken the assets of the Fund, failing to disclose that Defendants had concentrated more than half of the Fund's assets in PAAF, investing Fund assets contrary to the investment strategy represented in the PPM, failing to disclose that Bloom was receiving commissions from PAAM

based on North Hills Fund's investment in PAAF, misrepresenting the likelihood of recovery from PAAF, failing to disclose that Defendants had entered into an agreement that compromised the amount of funds to be received from PAAF, misrepresenting the status of distributions to be made by the Receiver, failing to disclose that Defendants had received funds related to the PAAF and issuing false statements and reports concerning the nature and status of the North Hills Fund and participants' interests and the nature and status of the PAAF investment and related distributions.

88.     Such acts were effected by use of the mails and other means or instrumentalities of interstate commerce, directly or indirectly, to engage in the business of a CPO or AP of a CPO.

89.     Bloom, directly or indirectly controlled NHM and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting NHM's violations alleged in this count. Bloom is thereby liable for NHM's violations of Section 4o(1) of the Act, 7 U.S.C. § 6o(1) (2006), pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2006).

90.     Bloom was acting as an agent of NHM when he violated the Act and, therefore, NHM, as Bloom's principal, is liable for Bloom's violations of Section 4o(1) of the Act, 7 U.S.C. § 6o(1) (2006), pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006).

91.     Each act of making false reports, false statements, and material omissions, and each misappropriation that occurred during the relevant period, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4o(1) of the Act, 7 U.S.C. § 6o(1) (2006).

## COUNT IV

### Violation of Section 4m(1) of the Act: Failure to Register as a CPO

92.    Paragraphs 1 through 91are re-alleged and incorporated herein.

93.    With certain exemptions and exclusions not applicable here, all CPOs operating a commodity pool are required to be registered with the Commission pursuant to Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2006).

94.    Section 4m(1) of the Act, 7 U.S.C § 6m(1) (2006), provides that it is unlawful for any CPO, unless registered under the Act, to make use of the mails or any means or instrumentality of interstate commerce in connection with his business as a CPO. Defendants never filed any Notice of Exemption from registration with the Commission.

95.    As alleged, during the relevant period, NHM acted as a CPO within the meaning of Section 1a(5) of the Act, 7 U.S.C. § 1a(5) (2006), and has used the mails or instrumentalities of interstate commerce in or in connection with a commodity pool as a CPO while failing to register as a CPO, in violation of Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2006).

96.    Bloom directly or indirectly controlled NHM and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting NHM's violations alleged in this count. Bloom is thereby liable for NHM's violations of Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2006), pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2006).

97.    Each use of the mails or any means or instrumentality of interstate commerce in connection with its business as a CPO without proper registration during the relevant period, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2006).

## COUNT V

### Violation of Section 4k(2) of the Act: Bloom's Failure to Register as an AP

98.    Paragraphs 1 through 97 are re-alleged and incorporated herein.

99.    Bloom solicited prospective participants on behalf of NHM to participate in the pool without the benefit of registration as an AP of a CPO in violation of Section 4k(2) of the Act, 7 U.S.C. § 6k(2) (2006).

100.    Bloom, as an agent of NHM, engaged in his solicitation and supervision activities for NHM without the benefit of registration as an AP of a CPO and, therefore, NHM is liable for Bloom's violation of Section 4k(2) of the Act, 7 U.S.C. § 6k(2) (2006), pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006).

## COUNT VI

### Disgorgement of Funds from the Relief Defendant

101.    Paragraphs 1 through 100 are re-alleged and incorporated herein.

102.    Defendants Bloom and NHM have defrauded North Hills Fund participants.

103.    The Relief Defendant, Lauren Bloom, received funds as a result of the Defendants' fraudulent conduct and has been unjustly enriched thereby.

104.    Lauren Bloom has no legitimate entitlement to or interest in all of the funds received as a result of the Defendants' fraudulent conduct.

105.    Lauren Bloom should be required to disgorge funds up to the amount she received from Defendants' fraudulent conduct or the value of those funds that she may have subsequently transferred to third parties.

## VI.    RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2006), and pursuant to its own equitable powers enter:

a) an order finding the Defendants violated Sections 4b(a)(2)(i)-(iii) of the Act, 7 U.S.C. §§ 6b(a)(2)(i)-(iii) (2006), with respect to acts occurring before June 18, 2008, and violated Sections 4b(a)(1)(A)-(C) of the Act as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(1)(A)-(C), with respect to acts occurring on or after June 18, 2008, and Sections 4c(b), 4k(2), 4m and 4o(1), of the Act, 7 U.S.C. § 6c(b), 4k(2), 4m, and 4o(1) (2006), and Commission Regulation 33.10, 17 C.F.R. § 33.10 (2008);

b) an order of permanent injunction prohibiting the Defendants from engaging in conduct violative of Sections 4b(a)(1)(A)-(C) of the Act as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(1)(A)-(C), with respect to acts occurring on or after June 18, 2008, and Sections 4c(b), 4k(2), 4m and 4o(1), of the Act, 7 U.S.C. § 6c(b), 4k(2), 4m, and 4o(1) (2006), and Commission Regulation 33.10, 17 C.F.R. § 33.10 (2008);

c) an order of permanent injunction enjoining Defendants and all persons insofar as they are acting in the capacity of their agents, servants, employees, successors, assigns, and attorneys, and all persons insofar as they are acting in active concert or participation with them who receive actual notice of such order by personal service or otherwise, from engaging, directly or indirectly, in any activity related to trading in any commodity, as that term is defined in Section 1a(4) of the Act, 7 U.S.C. § 1a(4) ("commodity interest"), including but not limited to, the following:

1.  Trading on or subject to the rules of any registered entity, as that term is defined in Section 1a(29) of the Act, 7 U.S.C. § 1a(29);

2.  Engaging in, controlling or directing the trading for any commodity interest account for or on behalf of any other person or entity, whether by power of attorney or otherwise;

3.  Soliciting or accepting any funds from any person in connection with the purchase or sale of any commodity interest;

4.  Entering into any commodity interest transactions for his own personal account, for any account in which he has a direct or indirect interest and/or having any commodity interests traded on his behalf;

5.  Engaging in any business activities related to commodity interest trading; and

6.  Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2008), or acting as a principal, agent or any other officer or employee of any person registered, exempted from registration or required to be registered with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2008);

d)  an order directing the Defendants and Relief Defendant to disgorge, pursuant to such procedure as the Court may order, all ill-gotten gains and/or benefits received from the acts or practices that constitute violations of the Act or Commission Regulations, as described herein, and interest thereon from the date of such violations;

e)  an order directing the Defendants to make full restitution to every participant whose funds were received as a result of acts and practices that constituted violations of the Act and Commission Regulations, described herein, and interest thereon from the date of such violations;

f)  an order directing the Defendants to each pay a civil monetary penalty of not more than the higher of $120,000 for each violation of the Act committed prior to October 23, 2004, $130,000 for each violation of the Act committed on or between October 23, 2004 and October 22, 2008, or $140,000 for each violation of the Act committed on or after October 23, 2008, or triple the monetary gain to the Defendants plus post-judgment interest;

g)  an order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (1994); and

h) such other and further remedial ancillary relief as the Court may deem appropriate.

Date: February 24, 2009

Respectfully submitted,

Gretchen L. Lowe
Associate Director
Glenn I. Chernigoff
Trial Attorney
U.S. Commodity Futures Trading
    Commission
Division of Enforcement
1155 21st Street, N.W.
Washington D.C. 20581
(202) 418-5379 (Lowe)
(202) 418-5305 (Chernigoff)
(202) 418-5523  (facsimile)
glowe@cftc.gov
gchernigoff@cftc.gov


David Acevedo
Chief Trial Attorney
Michael R. Berlowitz
Trial Attorney
U.S. Commodity Futures Trading
    Commission
Eastern Regional Office
140 Broadway, 19th Floor
New York, NY 10005
Telephone (646) 746-9747