**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**U.S. COMMODITY FUTURES TRADING**
**COMMISSION,**

        **Plaintiff,**

   v.

**MARK EVAN BLOOM AND NORTH HILLS**
**MANAGEMENT, LLC,**

        **Defendants.**

**Case No. 09 CV 1751 (JGK)**

**CONSENT ORDER OF**
**PERMANENT INJUNCTION**
**AND OTHER STATUTORY**
**AND EQUITABLE RELIEF**
**AGAINST DEFENDANTS**
**MARK EVAN BLOOM AND**
**NORTH HILLS**
**MANAGEMENT, LLC**

DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/11/10

On February 25, 2009, Plaintiff Commodity Futures Trading Commission

("Commission" or "CFTC") filed this civil enforcement action against Defendants Mark

Evan Bloom ("Bloom") and North Hills Management, LLC ("NHM") and Relief Defendant

Lauren Bloom, seeking injunctive and other equitable relief, as well as the imposition of

restitution and civil monetary penalties, for violations of the Commodity Exchange Act

("Act"), as amended, 7 U.S.C. §§ 1 *et seq.* (2006). Docket Entry ("DE") 1.

On February 25, 2009, pursuant to 7 U.S.C. § 13a-1, this Court issued an *Ex Parte*

Statutory Restraining Order ("SRO") that froze assets under the control of the Defendants

and the Relief Defendant, among other things. DE 2.

On March 9, 2009, this Court issued an Order of Preliminary Injunction and Other

Equitable Relief, which continued the provisions of the SRO, including the freeze of assets

under the control of the Defendants and the Relief Defendant, and the prohibition upon the

destruction of documents, among other things. DE 51.

On March 3, 2010, the Court issued a Consent Order Ending Case as to Relief

Defendant Lauren Bloom. DE 76.

**I.**

## CONSENTS AND AGREEMENTS

To effect settlement of the matters alleged in the Complaint in this action without a

trial on the merits, Bloom and NHM:

1.    Consent to the entry of this *Consent Order of Permanent Injunction and*

*Other Statutory and Equitable Relief Against Defendants Mark Evan Bloom and North Hills*

*Management, LLC* ("Order").

2.    Affirm that they have agreed to this Order voluntarily, and that no promise

or threat has been made by the Commission or any member, officer, agent or representative

thereof, or by any other person, to induce consent to this Order, other than as specifically set

forth herein.

3.    Acknowledge service of the Summons and Complaint.

4.    Admit that this Court has jurisdiction over them and the subject matter of

this case pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2006).

5.    Waive: (a) any and all claims which they may possess under the Equal

Access to Justice Act, 5 U.S.C. § 504 (2006) and 28 U.S.C. § 2412 (2006), and/or Part 148

of the Commission's Regulations ("Regulations"), 17 C.F.R. §§ 148.1 *et seq.* (2009),

relating to or arising from this action; (b) any and all claims that they may possess under the

Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121,

§§ 201-253, 110 Stat. 847, 857-868 (1996), as amended by Pub. L. No. 110-28 § 8302, 121

Stat. 112, 204-205 (2007), relating to or arising from this action; (c) any claim of Double

2

Jeopardy based upon the institution of this proceeding or the entry in this proceeding of any order imposing a civil monetary penalty or any other relief; and (d) all rights of appeal from this Order.

6.     Neither admit nor deny any of the findings and/or conclusions made in this Order or the allegations contained in the Complaint, except as to jurisdiction and venue, which they admit. However, Bloom and NHM agree that the allegations of the Complaint and all of the findings and conclusions made by this Court and contained in Part II of this Order shall be taken as true and correct and be given preclusive effect, without further proof, for the purpose of: any bankruptcy proceeding filed by on behalf of, or against Bloom or NHM whether inside or outside of the United States; a Commission registration proceeding relating to Bloom or NHM; and/or any proceeding to enforce the terms of this Order.

7.     Shall provide immediate notice of any bankruptcy filed by or on behalf of either of them in the manner required by Part V, paragraph 4 of this Order.

8.     Agree that the Court shall order Bloom and NHM to pay restitution and civil monetary penalties pursuant to the Act. Bloom and NHM further agree that prejudgment interest shall be due on both the civil monetary penalties and the restitution amounts, and that such prejudgment interest shall accrue beginning on February 25, 2009, based on the rate of interest set forth in 26 U.S.C. § 6621(a)(2) (2006).

9.     Agree that, unless the parties file a consent order specifying amounts of restitution and civil monetary penalties within thirty days after sentencing in *United States v. Mark Evan Bloom*, 09 cr 367 (JGK) (SDNY), the amounts of restitution and civil monetary penalties shall be determined by the Court upon motion of the Commission, and Bloom and NHM further agree that in connection with the Commission's motion for restitution and/or

3

civil monetary penalties, and at any hearing held on such motion: (a) Bloom and NHM will be precluded from arguing that they did not violate the Act as alleged in the Complaint; (b) Bloom and NHM may not challenge the validity of their consent to this Order; (c) for the purposes of such motion, the allegations of the Complaint and the findings of fact and conclusions of law in this Order shall be accepted as and deemed true by the Court; and (d) the Court may determine the issues raised in the motion on the basis of affidavits, declarations, excerpts of sworn testimony, and documentary evidence, without regard to the standards for summary judgment contained in Rule 56(c) of the Federal Rules of Civil Procedure. In connection with the Commission's motion for restitution and/or civil monetary penalties, the parties may take discovery.

10.   Agree that neither Bloom, NHM nor any of their agents or employees under their authority or control shall take any action or make any public statement denying, directly or indirectly, any allegation in the Complaint or findings or conclusions in this Order or creating, or tending to create, the impression that the Complaint or this Order is without a factual basis; provided, however, that nothing in this provision shall affect Bloom's and/or NHM's (a) testimonial obligations; or (b) rights to take legal positions in other proceedings to which the Commission is not a party. Bloom and NHM shall take all necessary steps to ensure that all of their agents and employees under their authority and control understand and comply with this agreement.

11.   Acknowledge that the Court's entry of a permanent injunction may have collateral consequences under federal or state law and the rules and regulations of self-regulatory organizations, licensing boards, and other regulatory organizations. Such collateral consequences include, but are not limited to, a statutory disqualification with

4

respect to membership or participation in, or association with a member of, a self-regulatory organization. This statutory disqualification has consequences that are separate from any sanction imposed in an administration proceeding. In addition, in any disciplinary proceeding before the Commission based upon the entry of the injunction in this action, Bloom and NHM both understand that they shall not be permitted to contest either the factual allegations of the Complaint or the findings of fact and conclusions of law in this Order.

12.     Consent to the continued jurisdiction of this Court for the purpose of: determining the amounts of restitution and civil monetary penalties; enforcing the terms and conditions of this Order; and for any other purpose relevant to this action, even if Bloom or NHM now or in the future reside outside the jurisdiction.

## II.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court, being fully advised in the premises, finds that there is good cause for the entry of this Order and that there is no just reason for delay. The Court therefore directs the entry of findings of fact, conclusions of law and a permanent injunction and ancillary equitable relief pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2006), as set forth herein.

## FINDINGS OF FACT

### A.     Formation of NHM and North Hills Fund

1.     In or around 1995, Bloom formed the North Hills Fund ("the Fund") and created NHM, as the general partner of the Fund. Bloom is the sole principal and owner of NHM. The Fund initially was purportedly designed to be an enhanced stock index fund and

5

traded, among other instruments, commodity futures contracts and options. In 2001, Bloom converted the Fund to an "absolute return fund" that would invest in other funds, i.e., a "fund of funds."

2. Defendants represented orally and in writing to existing and prospective Fund participants that Defendants would invest Fund assets in a number of other funds and, through diversification and lack of correlation, achieve a "market-neutral" return of approximately 12%.

3. Defendants provided existing and prospective Fund participants with a Private Placement Memorandum ("PPM") dated August 7, 2001, which attached a copy of the North Hills Limited Partnership Agreement (the "LPA"), subscription materials, and a Partnership Agreement Supplement. The LPA identified the objects and purposes of the Fund as investing and trading, on margin or otherwise in all forms of financial investments, including in commodities and commodity contracts.

4. The PPM represented that "[t]he Fund's multi-manager, multi-strategy approach has been designed to achieve above-average capital appreciation consistent with moderate risk." The PPM emphasized that "[t]hrough a program of diversified asset management, the Fund will be able to take advantage of investment opportunities with a significant potential reward, while reducing the risk of a substantial decline in the value of Partnership assets." Similarly, the PPM stated that a principal advantage of the Fund is its "policy of seeking satisfactory returns while minimizing total risk."

5. According to the PPM and LPA, Fund participants were to receive monthly reports and annual financial statements audited by an independent certified public accountant.

6

6.      The PPM also provides for management and incentive fees for NHM based upon the profitability of the Fund.

7.      The PPM also represented that NHM uses a management team comprised of consultants of Access International Advisors, EIM, USA and members of the Board of Directors that was to be responsible for the selection of money managers. It is unknown whether such a management team ever existed or was used by Defendants.

8.      Defendants instructed prospective Fund participants to execute a copy of the solicitation materials and send a check payable to North Hills LP. The minimum initial capital contribution allowed is $250,000.

9.      Based on Defendants' representations, the Fund had at least 30-40 participants and should have had assets of at least $30-40 million at one time.

10.     Fund participants relied upon Defendants' representations, the PPM, LPA and other solicitation materials and information concerning the Fund trading strategy in deciding whether to invest, remain invested or make additional investments with Defendants and the Fund.

11.     Fund participants included the Alexander Dawson Foundation ("ADF") and Alexander Dawson Inc. ("ADI"). ADF is a Nevada Charitable Trust that supports schools and over 1,000 students in Nevada and Colorado. ADI is an investment arm of ADF. ADI's and ADF's investment goals were to achieve moderate returns with limited risk. Inasmuch as Defendants' representations concerning the investment strategy for the Fund was consistent with their goals for their charitable endeavors, ADI and ADF decided to maintain their prior investments in the Fund and over time increased in their investments. ADF and ADI collectively invested $13.5 million with Bloom and NHM through the Fund.

7

12.    Fund participants received monthly account statements that consistently showed positive returns. Fund participants relied on these statements and made additional investments in the Fund.

13.    Although required by the LPA to provide annual financial statements to participants in the Fund, Defendants did not.

**B.    Bloom and NHM Misappropriate at Least $13 Million of Fund Assets**

14.    During the relevant period, Defendants misappropriated at least $13 million of the assets of the Fund for the personal use of Bloom and his wife, Relief Defendant Lauren Bloom. Defendants took the assets of the Fund by executing purported promissory notes with the Fund bearing an interest rate of the higher of 8% or the rate of return earned on all other Partnership assets, net of expenses.

15.    A purported independently certified annual financial statement for the Fund for the year ending December 31, 2002, lists notes receivable in the amount of $2.75 million as assets of the Fund. The notes to the financial statement set forth two notes as receivables from NHM to the Fund and state that "[t]he notes receivable were issued as capital contributions by [NHM]." At least some of the Fund's participants never received this financial statement until around or after November 2008.

16.    A purported independently certified financial statement for the Fund for the year ending December 31, 2003, lists additional notes receivable in the amount of $5.255 million as assets of the Fund as well as the 2002 notes for a total of approximately $8 million. The notes to the financial statement sets forth the notes as receivables from NHM to the Fund and states that "[t]he notes receivable were issued as capital contributions by [NHM]" and were charged against management's capital. At least some, if not all, of the

8

Fund's participants never received this financial statement until around or after November, 2008.

17. A Consolidated and Restated Demand Note ("the Consolidated Note") in the amount of $13,230,000.00 and dated December 31, 2004, was executed by Bloom on behalf of NHM through which NHM "borrowed" the assets of the Fund with promise to repay at the interest rate of the greater of 8% or the rate of return earned on all other partnership assets, net of expenses. The Consolidated Note was payable on demand. However, the Fund's general partner was NHM and NHM executed the Note on behalf of the Fund and itself. Upon information and belief, NHM on behalf of the Fund never demanded payment on the Consolidated Note from itself or Bloom.

18. By the same date of December 31, 2004, Bloom executed a Guaranty Agreement to and in favor of the Fund in his name and his wife's name through which he personally guaranteed payment and performance on the Consolidated Note. The Guaranty Agreement provides that the funds borrowed may in whole or in part be provided to or for the benefit of the Guarantors, the Blooms, and provides that each Guarantor will benefit or has materially benefited from the proceeds of the Note.

19. Until recently, Defendants did not disclose to any Fund participant that they were taking assets of the Fund to benefit personally Bloom and his wife.

20. By letter dated November 7, 2008, Defendants' counsel disclosed to certain Fund participants that "other than assets allocated to [the Philadelphia Alternative Asset Fund ("PAAF")] the remaining assets are in the form of notes payable from NHM which is presently unable to repay the debt." Counsel stated it was in excess of $8 million.

21. Throughout the relevant period, as the Blooms were taking more than $13

9

million of Fund assets, the Blooms maintained a lavish lifestyle. For example, in or around March 3, 2003, the Blooms purchased a luxury apartment at 10 Gracie Square on the Upper East Side of Manhattan for $5.2 million. Two years later, on around June or July 2005, Bloom transferred his ownership to his wife who sold it in 2007 for $11.2 million.

22. During the relevant period, Bloom and his wife maintained multiple apartments in Upper Manhattan, owned a condominium in Boynton Beach, Florida, maintained a boat, and leased several luxury cars.

23. The Fund's participants would not have invested or maintained investments with Defendants and the Fund if they had known that Defendants had engaged in self-dealing and taken at least $13 million of Fund assets. However, because they did not know and instead were receiving monthly statement showing profitable returns, the Fund's participants made additional investments in the Fund throughout the relevant period.

C.   **Bloom and NHM Invested Contrary to
     Represented Investment Strategy and Failed
     to Disclose Conflict of Interest with PAAF Investment**

24. Commencing in or around January 2004, Bloom entered into a Client Referral and Fee Sharing Agreement Fee Sharing Agreement with the Philadelphia Alternative Asset Management Company ("PAAM"), a registered Commodity Pool Operator ("CPO") managing multiple commodity futures and options pools, including PAAF.

25. Pursuant to that agreement, PAAM paid Bloom fees for directly or indirectly referring investors to the funds managed by PAAM. Bloom received approximately $1.6 million for referring investors to PAAM.

26. Commencing in February 2004 and thereafter, Defendants invested assets of

10

the Fund in PAAF, and Bloom collected referral fees based on the Fund's investment in PAAF of approximately \$356,000.

27.     Eventually, Defendants had approximately \$18 million of the Fund's assets in PAAF, which comprised approximately more than half of the assets of the Fund. This concentration in one fund was contrary to the multi-asset, multi-manager, diversified strategy represented in the PPM and LPA.

28.     In addition, PAAF traded exclusively commodity futures and options, which Defendants knew or should have known, are highly risky. Defendants' investment in PAAF was contrary to the diversification with reduction of risk approach that Defendants represented in the PPM to be the investment strategy of the Fund. It was also contrary to the reason why the Fund's participants invested with Defendants and the Fund.

29.     Fund participants did not learn of the concentrated and risky investment in PAAF until July 2005 when Defendants informed them that the CFTC had filed a massive fraud action against PAAM and Paul Eustace ("Eustace") and seized the assets under their control, including the assets of PAAF. *See CFTC v. Philadelphia Alternative Asset Management Co, and Eustace*, Civ. Action 05-2973 (E.D. Pa.).

30.     Fund participants were shocked to learn of the concentrated investment in PAAF and did not view it as consistent with the investment strategy of the Fund represented in the PPM and LPA.

31.     Like his failure to disclose that he had "loaned" his wife and himself \$13 million of Fund assets through promissory notes issued by NHM, Bloom never disclosed to the Fund's participants that he was a third-party marketer for PAAM and earning fees. Bloom did not disclose it even after he disclosed the concentrated investment in PAAF.

11

32. Instead of disclosing that Defendants had taken $13 million of Fund assets, that more than half of the assets were concentrated in one highly risky commodity futures and options fund and that Bloom was collecting commissions from the Fund's investment in PAAF, Defendants continued to issue false statements that misrepresented the nature and status of the Fund. For instance, in April 2004, Defendants issued to certain Fund participants an "Executive Summary" for the Fund which reiterated the balanced fund with a multi-strategy diversified risk approach. The Executive Summary provided investment allocation information, set forth the purported annual rates of return for each purported manager used, and represented that the Fund's average annual rate of return from July 2001 through December 2003 was 11.27%.

33. In addition, Defendants were meeting with the Fund's participants and orally making similar material misrepresentations and omissions.

34. To reassure certain Fund participants concerning the Defendants' compliance and diligence, Defendants retained a purported third-party sub-advisor who also met with participants. Through the sub-advisor, Defendants issued performance reports in June 2004, June 2005 and June 2006. None of the reports disclosed the $13 million of assets taken by NHM for Bloom's and his wife's use. The June 2005 report purports to list the hedge funds in which the Fund was invested. The June 2005 report did not list the approximately $18 million in PAAF and instead listed the allocations as follows: Airlie 10%, Centrix 5%, Gramercy 25%, Millennium 25%, Stewardship 25%.

### D. In 2006, Bloom Testified that a Fund Manager Should Disclose Conflicts and that He Would Never Invest In a

12

### Fund Where a Manager Loans Himself Fund Assets

35.     Bloom knew that borrowing funds and collecting third-party fees were conflicts of interest and material facts reasonable investors would have wanted to know. In fact, in sworn testimony in the CFTC's action against PAAM and Eustace in 2006, Bloom vehemently declared that defendant Eustace should have disclosed similar types of "loans" he made to himself out of PAAF assets and that Bloom never would have invested with Eustace if he had known Eustace was borrowing PAAF assets.

### E.     Bloom and NHM Misrepresented the Status of the Fund's Interests in PAAF

36.     In the CFTC's action against PAAM and Eustace, the court immediately appointed a receiver to marshal and distribute assets belonging to the various funds operated by PAAM and/or Eustace, including PAAF. The various funds defrauded by PAAM and Eustace had assets invested totaling approximately $250 million, with PAAF having approximately $28 million. The Fund's assets comprised more than half of PAAF's assets.

37.     As of the end of December 2008, the receiver in the CFTC's action against PAAM had distributed approximately $161 million across all the funds. Approximately $19 million of the $161 million was apportioned to PAAF and another fund into which Eustace had moved PAAF assets. The Fund's percentage interest in the approximate $19 million was approximately 54%.

38.     The Receiver assigned total distributions in the name of the Fund of approximately $9.6 million. Four distributions were made in the name of the Fund: 1) on December 26, 2006, approximately $1.8 million; 2) on December 15, 2008, approximately $4.2 million; 3) on March 5, 2008, approximately $1.6 million; and 4) on December 28, 2009, approximately $1.7 million.

13

39. On or around September 27, 2006, unbeknownst to the Fund's participants, Bloom, on behalf of the Fund executed a Participation Agreement with Stonehill Institutional Partners, L.P. ("Stonehill"). Pursuant to this agreement, Bloom compromised any return the Fund would receive from the receivership estate in the PAAM case. The Participation Agreement granted Stonehill a participation interest in the Fund's interest in PAAF and any amounts payable to the Fund from PAAF and the Receiver. As evidenced by executed instructions to the Receiver, all distributions in the name of the Fund were to be made to Stonehill with correspondence and other information continuing to be sent to Defendants.

40. Pursuant to the Participation Agreement, Bloom received from Stonehill in the name of the Fund upfront payments of approximately $2.3 million. Thereafter, Stonehill retained 20% of any PAAF distributions to the Fund and forwarded the remaining 80% to Bloom in the name of the Fund. As a result, Bloom received in the name of the Fund approximately $8 million from Stonehill.

41. Defendants did not disclose to the Fund's participants that Bloom had entered into the Participation Agreement with Stonehill. To the contrary, Bloom routinely sent written updates on the status of the CFTC's action, the receivership estate and the likelihood of recovering assets without ever mentioning the Stonehill agreement, that the receiver had made distributions and that Bloom had received payments relating to the PAAF distributions. Defendants also continued to send out monthly statements to Fund participants that did not credit or otherwise account for such distributions.

42. The Fund's participants expected any distributions made by the Receiver in the name of the Fund to then be distributed appropriately to them by Defendants.

14

43.     After the filing of the CFTC action against PAAM and Eustace, the Fund's participants began requesting full redemptions from the Fund. These requested redemptions have not occurred. Some Fund participants received partial redemptions; others have received nothing. The Fund's participants are out millions of dollars due to Defendants' fraud. Defendants used delaying tactics, lies, obfuscations and excuses, ranging from poor liquidity to blaming the Madoff debacle, to avoid meeting those demands.

44.     For example, in August 2005, after learning of the PAAM fraud, two related Fund participants who collectively had invested approximately $13.5 million immediately questioned Defendants and asked about redemptions. Bloom promised that they would not lose anything as a result of the PAAF demise and made a partial redemption payment of $4 million in the fall of 2005. On November 30, 2007, they requested redemption of another $3.5 million. Bloom tried to delay responding to that request with excuses of a plan to increase performance with a new manager. In January 2008, the two Fund participants requested full redemption of their entire $13.8 million, or at least the $4.8 million of their funds that was not purportedly in the PAAF investment. In March 2008, Defendants redeemed only $1 million to them.

45.     Throughout, Defendants continued to send monthly statements showing positive balances. For instance, the two Fund participants discussed in paragraph 44, above, received September 30, 2008 account statements showing collectively that they had over $12 million in capital with approximately $7.7 million allocated to PAAF and showing a gain of approximately $5,000 on the remaining $4.7 million. In October 2008, the two Fund participants demanded documentation and an accounting of their investments and the assets of the Fund. Eventually, they learned through Bloom's counsel that he had taken assets of

15

Fund as "loans" to himself.

46.     Since the filing of the CFTC's action against PAAM and Eustace, Bloom personally appeared in federal court in that action representing the Fund and other funds he managed and claiming to be a victim of fraud.

47.     Defendants knowingly or with reckless disregard for the truth committed the foregoing acts of fraud, misappropriation, false statements and reports, and material misrepresentations and omissions of fact.

48.     Defendants continued to solicit new funds from new prospective participants and tried to delay meeting demands from Fund participants. Indeed, by letter dated February 11, 2009 and on Fund letterhead, Bloom represented "I am in the process of securing funds which should allow me to return the full amount of your investment balance. My hope is that it can be all worked out in the next month. I ask for your patience, as my success in that endeavor offers you the greatest chance for the best possible return of your investment."

## CONCLUSIONS OF LAW

49.     By the conduct identified above, Bloom and NHM knowingly, or with reckless disregard for the truth, cheated or defrauded or attempted to cheat or defraud other persons; willfully made or caused to be made false reports or statements to other persons; and willfully deceived or attempted to deceive other persons, in or in connection with orders to make, or the making of, contracts of sale of commodities for future delivery, made, or to be made, for or on behalf of any other persons, where such contracts for future delivery were or might be used for the purposes set forth in Section 4b(a) of the Act, by misappropriating assets of the Fund for Defendants' personal benefit, failing to disclose that Defendants had

16

taken the assets of the Fund, failing to disclose that Defendants had concentrated more than half of the Fund's assets in PAAF, investing Fund assets contrary to the investment strategy represented in the PPM, failing to disclose that Bloom was receiving commissions from PAAM based on the Fund's investment in PAAF, misrepresenting the likelihood of recovery from PAAF and failing to disclose that Defendants had entered into an agreement that compromised the amount of funds to be received from PAAF, misrepresenting the status of distributions to be made by the Receiver and failing to disclose that Defendants had received funds related to PAAF and issuing false statements concerning the nature and status of the Fund's participants' interests, all in violation of Sections 4b(a)(2)(i)-(iii) of the Act, 7 U.S.C. §§ 6(b)(a)(2)(i)-(iii) (2006), with respect to conduct before June 18, 2008.

50.     By the conduct identified above, Bloom and NHM knowingly, or with reckless disregard for the truth, cheated or defrauded or attempted to cheat or defraud other persons; willfully made or caused to be made false reports or statements to other persons; and willfully deceived or attempted to deceive other persons, in or in connection with orders to make, or the making of, contracts of sale of commodities for future delivery, made, or to be made, for or on behalf of any other persons, where such contracts for future delivery were or might be used for the purposes set forth in Section 4b(a) of the Act, by misappropriating assets of the Fund for Defendants' personal benefit, failing to disclose that Defendants had taken the assets of the Fund, failing to disclose that Defendants had concentrated more than half of the Fund's assets in PAAF, investing Fund assets contrary to the investment strategy represented in the PPM, failing to disclose that Bloom was receiving commissions from PAAM based on the Fund's investment in PAAF, misrepresenting the likelihood of recovery from PAAF and failing to disclose that Defendants had entered into an agreement

17

that compromised the amount of funds to be received from PAAF, misrepresenting the status of distributions to be made by the Receiver and failing to disclose that Defendants had received funds related to PAAF and issuing false statements concerning the nature and status of the Fund's participants' interests, all in violation of Sections 4b(a)(1)(A)-(C) of the Act, as amended by the Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, Title XIII (the CFTC Reauthorization Act of 2008 ("CRA")), § 13102, 122 Stat. 1651 (enacted June 18, 2008), to be codified at 7 U.S.C. §§ 6(b)(a)(1)(A)-(C), with respect to conduct on or after June 18, 2008.

51.     By the conduct identified above, Bloom and NHM knowingly, or with reckless disregard for the truth, cheated or defrauded or attempted to cheat or defraud another person; made or caused to be made to another person a false report or statements or caused to be entered for another person a false record; deceived or attempted to deceive another person by any means whatsoever, in or in connection with commodity option transactions by misappropriating assets of the Fund for Defendants' personal benefit, failing to disclose that Defendants had taken the assets of the Fund, failing to disclose that Defendants had concentrated more than half of the Fund's assets in PAAF, investing Fund assets contrary to the investment strategy represented in the PPM, failing to disclose that Bloom was receiving commissions from PAAM based on the Fund's investment in PAAF, misrepresenting the likelihood of recovery from PAAF and failing to disclose that

Defendants had entered into an agreement that compromised the amount of funds to be received from PAAF, misrepresenting the status of distributions to be made by the Receiver and failing to disclose that Defendants had received funds related to PAAF and issuing false statements concerning the nature and status of the Fund's participants' interests, all in

18

violation of Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2006), and Regulation 33.10, 17 C.F.R. § 33.10 (2009).

52. By the conduct identified above, NHM and Bloom, while acting as a CPO and Associated Person ("AP") of a CPO, respectively, employed a device, scheme or artifice to defraud pool participants and prospective pool participants or engaged in a transaction, practice or course of business that operated as a fraud or deceit upon pool participants and prospective pool participants by misappropriating assets of the Fund for Defendants' personal benefit, failing to disclose that Defendants had taken the assets of the Fund, failing to disclose that Defendants had concentrated more than half of the Fund's assets in PAAF, investing Fund assets contrary to the investment strategy represented in the PPM, failing to disclose that Bloom was receiving commissions from PAAM based on the Fund's investment in PAAF, misrepresenting the likelihood of recovery from PAAF and failing to disclose that Defendants had entered into an agreement that compromised the amount of funds to be received from PAAF, misrepresenting the status of distributions to be made by the Receiver and failing to disclose that Defendants had received funds related to PAAF and issuing false statements concerning the nature and status of the Fund's participants' interests, all in violation of Section 4o(1) of the Act, 7 U.S.C. § 6o(1) (2006).

53. Each act of fraudulent misappropriation, fraudulent omission and false statement or report, including but not limited to those specifically alleged herein, is a separate and distinct violation of Sections 4b(a)(2)(i)-(iii), 4c(b) and 4o(1) of the Act, Sections 4b(a)(1)(A)-(C) of the Act as amended by the CRA, and Regulation 33.10.

54. NHM used the mails or instrumentalities of interstate commerce in or in connection with its business as a CPO while failing to register with the Commission as a

19

CPO, in violation of Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2006).

55.     Bloom was associated with NHM in a capacity that involved the solicitation of funds for participation in the Fund but failed to register with the Commission as an AP of NHM, in violation of Section 4k(2) of the Act, 7 U.S.C. § 6k(2) (2006).

56.     In addition to his direct liability, Bloom, directly or indirectly, controlled NHM and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting NHM's violations of the Act and Regulations . Therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2006), Bloom is liable as a controlling person of NHM for NHM's violations of Sections 4b(a)(2)(i)-(iii), 4c(b) and 4o(1) of the Act, Sections 4b(a)(1)(A)-(C) of the Act as amended by the CRA, and Regulation 33.10.

57.     Bloom was acting as an agent of NHM when he engaged in the acts constituting his violations of the Act and Regulations as set forth above. Therefore, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), NHM, as Bloom's principal, is liable for Bloom's acts in violations of Sections 4b(a)(2)(i)-(iii), 4c(b) and 4o(1) of the Act, Sections 4b(a)(1)(A)-(C) of the Act as amended by the CRA, and Regulation 33.10.

## III.

## ORDER FOR PERMANENT INJUNCTION

## NOW THEREFORE, IT IS ORDERED THAT:

Defendants Bloom and NHM shall be permanently restrained, enjoined and prohibited from directly or indirectly engaging in:

1.     conduct in violation of Sections 4c(b), 4o(1), 4m(1) and 4k(2) of the Act, Sections 4b(a)(1)(A)-(C) of the Act as amended by the CRA, and Regulation 33.10;

20

2.    trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(29) of the Act);

3.    entering into any transactions involving commodity futures, options on commodity futures, commodity options (as that term is defined in Regulation 32.1(b)(1)) ("commodity options"), and/or foreign currency (as described in Sections 2(c)(2)(B) and 2(c)(2)(C)(i) of the Act as amended by the CRA ("forex")) for their own personal accounts or for any account in which either of them has a direct or indirect interest;

4.    having any commodity futures, options on commodity futures, commodity options, or forex contracts traded on either of their behalves;

5.    controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity futures, options on commodity futures, commodity options, or forex contracts;

6.    soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity futures, options on commodity futures, commodity options, or forex contracts;

7.    applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14 (a)(9); and

8.    acting as a principal (as that term is defined in Regulation 3.1(a)), agent or any other officer or employee of any person registered, exempted from registration or required to be registered with the Commission, except as provided for in Regulation 4.14 (a)(9).

21

## IV.

## STATUTORY AND EQUITABLE RELIEF

### IT IS FURTHER ORDERED THAT:

1.     Bloom and NHM shall pay full restitution (including prejudgment and post-judgment interest) to each participant in the Fund. If the parties do not file a consent order specifying the amount the parties agree is full restitution within thirty days after sentencing in *United States v. Mark Evan Bloom*, 09 cr 367 (JGK) (SDNY), the Court will schedule a hearing to determine the appropriate amount of restitution. Bloom and NHM shall pay restitution to a receiver or monitor appointed by this Court until their restitution obligation is fully satisfied.

2.     Defendants NHM and Bloom shall each pay a civil monetary penalty (including prejudgment and post-judgment interest) in an amount to be specified at the time the parties specify restitution, as set forth above ("CMP Obligations"). If the parties do not file a consent order specifying the amounts the parties agree are the CMP Obligations within thirty days after sentencing in *United States v. Mark Evan Bloom*, 09 cr 367 (JGK) (SDNY), the Court will schedule a hearing to determine the appropriate CMP Obligations.

3.     In connection with any motion to determine the amount of restitution and civil monetary penalties, and at any hearing held on such a motion: (a) Defendants shall be precluded from arguing that they did not violate the federal and state laws as alleged in the Complaint; (b) Defendants may not challenge the validity of their consents and agreements herein or this Order; (c) for the purposes of such motion, the allegations of the Complaint and the findings and conclusions in this Order shall be accepted as and

22

deemed true by the Court; and (d) the Court may determine the issues raised in the motion on the basis of affidavits, declarations, excerpts of sworn deposition or investigative testimony, and documentary evidence, without regard to the standards for summary judgment contained in Rule 56(c) of the Federal Rules of Civil Procedure. In connection with any such motion for restitution and civil monetary penalties, the parties may take discovery, including discovery from appropriate non-parties.

4.     All payments by Bloom and NHM pursuant to this Order shall first be applied to satisfaction of their restitution obligations. After satisfaction of their restitution obligations, Bloom's and NHM's payments pursuant to this Order shall be applied to their civil monetary penalties.

5.     Bloom and NHM shall cooperate fully and expeditiously with the Commission, including the Commission's Division of Enforcement, in any current or future investigation, civil litigation or administrative matter related to the subject matter of this action. This includes cooperating fully with the Commission in its investigation of: a) the amount of funds and proceeds received by Defendants, and losses to Defendants' customers; and b) the identification of Defendants' assets. Bloom and NHM shall comply fully, promptly, and truthfully with any inquires or requests for information from the Commission, including but not limited to, requests for production and authentication of documents and shall provide assistance at any trial, proceeding, or Commission hearing, including but not limited to, requests for testimony, depositions, and/or interviews, and shall testify completely and truthfully in any such proceeding, trial, or investigation and consistent with the statements and information they have provided the Commission.

23

V.

## MISCELLANEOUS PROVISIONS

1.    If any provision of this Order or the application of any provision or circumstance is held invalid, the remainder of this Order, and the application of the provision to any other person or circumstance, shall not be affected by the holding.

2.    This Court shall retain jurisdiction of this action in order to implement and carry out the terms of all orders and decrees, including orders setting the appropriate amounts of restitution and civil monetary penalty, that may be entered herein, to entertain any suitable application or motion for additional relief within the jurisdiction of this Court, and to assure compliance with this Order.

3.    All notice required to be given by any provision in this Order shall be sent by certified mail, return receipt requested, as follows:

Notice to the Commission:    Gretchen L. Lowe
Glenn I. Chernigoff
Division of Enforcement
Three Lafayette Centre
1155 21st Street, NW
Washington, D.C. 20581

Notice to Defendants
Bloom and NHM:    Mark Evan Bloom
101 West 55th Street
Apartment 11J
New York, NY 10019

4.    In the event that Defendant Bloom changes his residential or business telephone number(s) and/or address(es) at any time, he shall provide written notice of the new number(s) and/or address(es) to the Commission within ten calendar days of the change(s) to his address(es).

5.    Authority: Bloom hereby warrants that he is the sole principal of NHM

24

and that this Order has been duly authorized by NHM.

IT IS SO ORDERED, at New York, New York on this _11_ day of
_June_ ~~_____~~, 2010.

_____
HON. JOHN G. KOELTL
UNITED STATES DISTRICT JUDGE

APPROVED FOR ENTRY BY:

PLAINTIFF U.S. COMMODITY FUTURES
TRADING COMMISSION

By: _____          Dated: _6-10-10_
Gretchen L. Lowe
Associate Director
Kevin Batteh
Chief Trial Attorney
Glenn I. Chernigoff
Trial Attorney
Division of Enforcement
U.S. Commodity Futures Trading Commission
1155 21st Street, N.W.
Washington, D.C. 20581
Telephone - (202) 418-5000
Facsimile – (202) 418-5523

DEFENDANT MARK EVAN BLOOM

_____          Dated: _6-4-10_

DEFENDANT NORTH HILLS MANAGEMENT, LLC

_____          Dated: _6-4-10_

25

By: Mark E Bloom